IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 17-cr-307-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    **BRANDON RONDELL WASHINGTON,**

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

The Government charges Defendant Brandon Washington ("Washington") with possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)), possession of a controlled substance with the intent to distribute (21 U.S.C. § 841(a)(1)), and possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)). (*See* ECF No. 1.) Washington has filed a Motion to Suppress (ECF No. 20), arguing that he was subject to a traffic stop that impermissibly escalated into a full custodial arrest without probable cause, and so the evidence found on his person and in his car should be suppressed.

Neither Washington nor the Government requests an evidentiary hearing. After reviewing the parties' briefs and watching a video of the incident in question (*see* ECF No. 40), the Court finds that the material facts are not in dispute and that the question may be answered as a matter of law. For the reasons explained below, the Court finds that, even assuming Washington was never subject to anything more than an

investigatory detention (as the Government contends), the Government has failed to justify the search of Washington's person that led to the discovery of drugs on his person and both drugs and a gun in his vehicle. Thus, Washington's Motion to Suppress will be granted and the evidence discovered through that unlawful search will be suppressed.

## I. FACTS

The following facts are based on the parties' representations in their briefs and on the videos submitted at ECF No. 40.

Aurora Police Department Sergeant Longnecker[1] was sitting in his patrol car on April 22, 2017, when he witnessed a traffic accident at 5:47 PM at the intersection of Peoria Street and 17th Avenue in Aurora. Specifically, Longnecker observed a red Mitsubishi vehicle run a red light and broadside another vehicle crossing through the intersection. The Mitsubishi then rolled to a stop along the curb just south of the intersection. Longnecker maneuvered his patrol car behind the Mitsubishi and activated his emergency lights. Longnecker's body cam captured most of the ensuing encounter with the Mitsubishi's driver and sole occupant, Defendant Washington.

By the time Longnecker exited his patrol car, Washington had partly opened his driver's side door and placed his left foot on the ground immediately outside the car, while otherwise remaining seated in the driver's seat. As Longnecker approached the driver's side door, he asked, "You all right?" The video contains no audible response from Washington.

Longnecker says that, around this time, he could see Washington trying to stuff

---

[1] His first name is not in the record.

2

something under his leg.  This is not visible in the video, although Washington's manner of leaning forward is consistent with this account.  Washington by this point was leaning slightly out of the car and heavily forward, almost as if trying to touch his nose to his left knee.

Longnecker immediately asked, "What are you doing, bud?  Stay in there, stay in there, what's wrong?  You hurt your leg?"  Washington answered, "Little bit."  Longnecker then told Washington to "lean back."  He then continued to question Washington: "What's wrong?  Your leg?  Huh?  Can you lay back in the seat?"  The music in Washington's car was also rather loud, so Longnecker asked Washington if he could "reach up and turn that music down."  Washington did so, and Longnecker continued, "What's hurting?  Huh?"  Washington replied, "Nothing."  Longnecker then asked, "Is this your car?"  Washington answered, "Rental car."  By this time Washington had moved his left leg back into the car.

Longnecker turned his focus to Washington's left hand which was clenched into a fist and resting, fingers down, on the outside of his front left pants pocket.  Longnecker inquired, "What do you got in your hand now?  You're just holding your—your—", at which point Washington responded, "Hand kinda tight."  Longnecker again told Washington to "lean back" and again asked, "What's in your hand?", at that point reaching down with his left hand and grabbing Washington's left wrist.  Longnecker began trying to gently pull Washington's fist away from his (Washington's) body and Washington resisted, prompting Longnecker to ask yet again "What is in your hand, dude?" while still holding Washington's wrist.

Instead of answering Longnecker's question, Washington asked, "Can I get out?"

Longnecker quickly and sternly responded, "No, stay in your car, just relax, I've got rescue coming." According to the video, Longnecker then placed his right hand on Washington's shoulder, let go of Washington's wrist with his left hand, and Longnecker used his left hand to operate his shoulder radio and call for additional support. The parties briefs, however, state that Longnecker pinned Washington's left hand to his (Longnecker's) left side as he called for support. (ECF No. 20 ¶ 5; ECF No. 32 at 2.) This seems impossible, at least as of the moment Longnecker was calling for support, but the Court assumes that Longnecker used his left hand to grab Washington's wrist again immediately after he had finished operating the radio.

After Longnecker's brief radio call, Washington started leaning forward and out of the driver's side door and moved his leg out of the car again, abruptly announcing, "I need to get out." Longnecker forcefully responded, "No, stay in the car," and—using his right hand which was still on Washington's left shoulder—tried to push Washington down into his seat. Washington continued to push his way out, stating, "I need to get out, dog." Longnecker again refused, commanding Washington to "stay in the car, dude." Washington did not obey.

By this time, a second officer named Petering had arrived and Longnecker told him, "He's got something in his hand." Washington began struggling with the officers, who told him to "stop fighting" and "stop resisting." Petering then deployed his taser on Washington's leg, and Washington fell back onto the driver's side seat. He retreated until he was laying with his torso across the passenger side seat and his legs across the driver's side seat. His head rested against the passenger side window, which was already rolled down about one-quarter of the way.

Longnecker moved around to the passenger side door and began speaking to other officers who had just arrived: "This guy's fighting with us, you ready, he's going to the ground. He's already been tased." Longnecker then whipped open the passenger side door and he and another officer pulled Washington out of the car and onto the sidewalk face down. They began shouting repeatedly, "Give me your hands!" and Longnecker told his fellow officers, "He's got something in his hands that he won't give up." Washington continued to resist, although he was not thrashing. He told them several times, "My hands hurt," as the officers tried to pry them open. Unsuccessful in these further attempts, Longnecker ordered another officer to tase Washington again. The officer deployed the Taser against the back of Washington's left shoulder, which allowed the other officers—after still more resistance—to pull Washington's arms behind his back and handcuff him in that position.

Washington started repeatedly crying, "I can't breathe!" The police officers rolled Washington onto his left side, still unable to pry open his hands. Longnecker said to someone on his radio, "We've got him in custody. He's still fighting with us, though." After about a minute in which all parties were apparently just catching their breath, another officer managed to pry open one of Washington's hands at least somewhat and announced, "It's a bunch of dope." Yet another officer told Washington to "give it up" because he was "already going," apparently meaning that Washington was going to go to jail on account of what the police had just discovered.

About this time Washington finally relented and the officers found plastic bindles in both hands which appeared to contain cocaine. They also removed $1,378 in currency from Washington's front right pants pocket. A drug dog sniffed the currency

5

and alerted to the presence of a controlled substance.

Officers performed an inventory search of Washington's vehicle and located a stolen, loaded pistol in the center console. Officer Petering observed numerous plastic bindles in plain view inside the vehicle. Nine bindles field-tested positive for powder cocaine and twenty-nine bindles field-tested positive for crack cocaine.

## II. BURDEN OF PROOF

On a motion to suppress evidence derived from a warrantless search, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id.* at nn.1–2 (citing authorities); 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at n.35 and accompanying text (5th ed., Oct. 2017 update) ("*Search & Seizure*").

Washington's motion reveals that his personal Fourth Amendment rights are implicated here. He has therefore raised a *prima facie* case of a potential Fourth Amendment violation through a warrantless search, thus shifting the burden to the Government to justify the search.

## III. ANALYSIS

The Fourth Amendment to the U.S. Constitution safeguards the "[t]he right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures." Generally speaking, to conduct a search or seizure in compliance with the Fourth Amendment, the police must obtain a warrant from a neutral

magistrate based on a finding of probable cause. *See Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009). However, not all interactions with law enforcement trigger Fourth Amendment protection, or necessarily require a warrant.

The Tenth Circuit has described three types of "police-citizen encounters," each of which requires a different level of suspicion in order to be permissible under the Fourth Amendment:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012). Thus, although a warrantless arrest is unreasonable without probable cause that a crime has been committed, warrantless "detentions" that fall short of an arrest need only be justified by "reasonable suspicion." *Id.* These sort of investigative detentions are known as *Terry* stops because the Supreme Court first began to establish the legal framework for such detentions in *Terry v. Ohio*, 392 U.S. 1 (1968). The suspicion required by law enforcement to justify a *Terry* stop is "considerably less" than that required for probable cause. *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012).

All parties agree that this case begins with a traffic stop, which is "a 'seizure' within the meaning of the Fourth Amendment," and is analyzed "under the principles developed for investigative detentions set forth in *Terry*," *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998), although it need not be justified by suspicion of *criminal* activity. Rather, an officer needs only "a reasonable articulable suspicion that a

particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

Washington does not dispute that Longnecker saw Washington run a red light and collide with another car, nor that Longnecker thereby gained at least reasonable suspicion of a traffic violation to justify a traffic stop. And the parties also agree that, at some point during Longnecker's encounter with Washington, the situation escalated from a routine traffic stop to something more serious. In Washington's view, it rose immediately from a traffic stop to a custodial arrest, like ice sublimating to vapor, yet without probable cause—so a search incident to arrest could not have been justified. (ECF No. 20 ¶¶ 9–10, 14–16.) Washington believes that the turning point in the encounter was when Longnecker allegedly pinned Washington's hand to his left side while calling for "rescue" (ECF No. 38 ¶ 3), *i.e.*, just before Washington's attempted exit from the car and the ensuing struggle. At that moment, says Washington, he was under arrest.

The Government identifies the same turning point, but says that the encounter went from a mere traffic stop to an investigative detention under *Terry* (reasonable suspicion of criminal activity, not just a traffic infraction), and that the ensuing use of force was reasonable under the circumstances to keep the situation under control while the investigation progressed. (ECF No. 32 at 6–9.)

At this point, it is worth noting the many potential arguments that the Government does not make:

- The Government does not claim that Longnecker, from the moment he saw the traffic accident, had probable cause to arrest Washington on

8

some sort of municipal or other charge.[2]

- The Government does not rely on the fact that there was no potential Fourth Amendment "search" violation (*i.e.*, nothing to suppress) until well after the alleged pin-the-fist-against-the-leg moment, and does not argue that probable cause arose soon after that moment through Washington's disobedience of Longnecker's order to stay in the car and/or his active struggle with Longnecker and Petering.[3]

- The Government does not argue that, no matter what else happened, Longnecker or another officer would have certainly examined Washington's car closely if only to complete a traffic accident report, and would have noticed the cocaine bindles in plain view, which would inevitably have provided probable cause to search Washington.[4]

Accordingly, the Court will not explore these possibilities any further.

The dispute, as framed by the parties, appears to call for three inquiries: when

---

[2] *Cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998) ("A warrantless search preceding an arrest is a legitimate 'search incident to arrest' as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search. Whether or not the officer intended to actually arrest the defendant at the time of the search is immaterial to this two-part inquiry." (citations omitted)); *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) ("the legitimate basis [inquiry] is purely an objective standard and can be [satisfied by] *any crime*, not merely that for which the defendant is ultimately charged" (emphasis in original)); *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000) (search incident to arrest "is not limited to a frisk for weapons, but may have as its purpose a search for evidence of a crime").

[3] *See* n.2, above.

[4] *See* 3 *Search & Seizure* §§ 7.5(a) (discussing the plain view doctrine), 11.4(a) (discussing the inevitable discovery doctrine).

9

did the encounter between Longnecker and Washington escalate from a traffic stop to something else; was that "something else" a *Terry* stop or a full arrest; and what did the Fourth Amendment permit Longnecker to do at that point? However, it turns out the Court need not answer all of these questions because it is clear from the arguments the Government actually makes that it cannot carry its burden to justify the warrantless search.

From the pin-the-fist-against-the-leg moment, according to the Government,

> the traffic stop ceased to be a routine traffic stop and turned into a *Terry* investigative detention based on reasonable suspicion of criminal activity. Sgt. Longnecker gained a particularized and objective basis for suspecting that Washington was involved in criminal activity (hiding contraband in his hand and under his leg) for the following reasons. First, when Sgt. Longnecker approached the vehicle, he observed Washington was bent over and appeared to be stuffing something under his leg. Second, Sgt. Longnecker observed that Washington's left hand was clenched into a fist. When asked what was in his hand, Washington stated "Nothing" and that his hand was "Kinda tight." Third, Washington refused to open his clenched fist. Fourth, Washington asked if he could get out of the vehicle. These facts, along with the fact that Washington just sped through an intersection and collided with another vehicle, gave Sgt. Longnecker reasonable suspicion that Washington was involved in criminal activity.

(ECF No. 32 at 7 (citations omitted).) Moreover, says the Government, once a struggle ensued, Longnecker and his fellow officers could justifiably use force "to freeze temporarily a potentially dangerous situation" without converting the *Terry* stop into a full custodial arrest. (*Id.* at 8 (quoting *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993)).) Finally, the Government argues that the use of force the officers actually employed remained within the bounds of a permissible *Terry* stop under the circumstances. (*Id.* at 8–9.)

10

The Court may assume without deciding that the Government is correct as to all of these arguments. Even so, the Government fails to address the legal basis for the officers' insistence on prying open Washington's hands as part of this assumed *Terry* stop. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range *is armed and presently dangerous to the officer or to others*," the officer may "take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24 (emphasis added). But, "[b]efore [the officer] places a hand on the person of a citizen" to conduct this "self-protective search for weapons," the officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968).

Moreover, a search for weapons is the *only* sort of search of a person that an officer may conduct in a *Terry* context. "Nothing in *Terry* can be understood to allow . . . any search whatever for *anything but weapons*." *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979) (emphasis added). If, in the course of a justifiable search for weapons, an officer conducting a patdown immediately recognizes that he or she is feeling nondangerous contraband, then it also may be seized—but again, the impetus of the search must be a reasonable belief that the suspect is armed and poses a threat to the officer or others nearby. See *Minnesota v. Dickerson*, 508 U.S. 366, 373–76 (1993).

Here, the Government never represents that Longnecker felt, or even had reason to feel, that Washington's clenched fist concealed something dangerous to Longnecker or others nearby. Absent such a representation, Longnecker had no authority under *Terry* beyond preventing Washington from leaving the scene. He and his fellow officers

11

specifically lacked authority to conduct a search of Washington's person, to force open either of Washington's hands to reveal suspected *nondangerous* contraband, or to perform a complete search of Washington's pockets.[5] *Cf. Sibron*, 392 U.S. at 65 ("In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man."). Accordingly, the Government has failed to meet its burden to justify its warrantless search of Washington. The items discovered in Washington's hands and on his person, and their "fruits" (including the drugs and firearm discovered during the search of Washington's vehicle), must be suppressed.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Washington's Motion to Suppress (ECF No. 20) is GRANTED. The evidence obtained as a result of the unlawful search performed upon Washington is hereby SUPPRESSED.

2. The Government shall file a status report no later than **May 15, 2018** informing the Court whether it plans to proceed with this prosecution, to appeal, or to take some other course of action. If the Government plans to proceed with the prosecution, the Court will promptly enter an order setting a new trial date and

---

[5] The Government cites no authority, and the Court is aware of none, that a suspect detained under *Terry* and forcibly restrained, such as with handcuffs, may be more thoroughly searched as part of "freezing" the scene.

12

related deadlines.

Dated this 24th day of April, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge

13